UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

_____

Jesus Rafael Roman Rodriguez,                    File No. 23-cv-3911 (ECT/JFD)

        Petitioner,

v.                                              **OPINION AND ORDER**

Maria Luisa Sanchez Noriega,

        Respondent.

_____

M. Boulette and Laura Elaine Kvasnicka, Taft Stettinius & Hollister LLP, Minneapolis, MN, for Petitioner Jesus Rafael Roman Rodriguez.

Maria Luisa Sanchez Noriega, *pro se*.

_____

        Petitioner Jesus Rafael Roman Rodriguez ("Father") alleges Respondent Maria Luisa Sanchez Noriega ("Mother") removed their child, R.R.S., from Mexico in violation of the Hague Convention on the Civil Aspects of International Child Abduction. Father seeks the child's return to Mexico so that custody questions may be decided by a court there. Mother wishes to maintain custody of R.R.S. in Minnesota. R.R.S. will be ordered returned to Mexico because Father proved that Mother wrongfully removed the child, and Mother has not carried her burden of proving any affirmative defense.

I[1]

Mother and Father are the parents of minor child R.R.S.  Tr. 7:18–23; P-2.  R.R.S. was born in Culiacan, Sinaloa, Mexico in 2018.  Tr. 8:1–2; P-2.  She lived in Culiacan from her birth in 2018 until May 2021.  Tr. 27:8–11.  R.R.S. is a citizen of Mexico and does not have legal status in the United States.  Tr. 8:21–22, 14:19–16:9.

Mother and Father never married or lived together.  Tr. 27:20–28:4.  In Culiacan, R.R.S. resided with Mother and R.R.S.'s half-brother.  ECF No. 29 at 2; *see* Tr. 112:2–3 ("[S]he has always lived with us since she was born, her brother and I at home.").  Until 2021, R.R.S. received childcare and medical care in Culiacan, and was pre-enrolled to attend school there.  Tr. 8:23–9:12, 27:8–19.  R.R.S. has many family members in Sinaloa, including paternal aunts, uncles, cousins, grandparents, and great-grandparents, and maternal aunts, uncles, cousins, and grandparents.  Tr. 71:15–72:3.

Mother and Father were employed in Culiacan, and R.R.S. attended a daycare facility in Culiacan on weekdays.  Tr. 29:9–23, 50:19–22, 59:3–18, 72:23–73:2.  Each weekday after daycare, R.R.S. would be cared for at the residence of a paternal relative until Mother's workday ended.  Tr. 36:6–10, 51:9–20.  The record is unclear as to the frequency with which R.R.S. went to her paternal grandparents' home, her paternal great-grandparents' home, or her paternal aunt's home after daycare.  *See* Tr. 9:16–9:20

---

[1]      This opinion describes the factual findings and legal conclusions required by Federal Rule of Civil Procedure 52(a)(1).  "P-#" exhibits are Father's trial exhibits.  Cited page numbers refer to the offering party's stamped exhibit page numbering, unless otherwise specified.  The sealed evidentiary hearing transcript ("Tr.") is docketed at ECF No. 28.  The transcript will be cited by transcript page number and line.

(grandparents); Tr. 51:9–16 (great-grandparents); Tr. 53:12–24 (aunt).  Regardless, the record shows R.R.S. was cared for by Father's family every day following daycare, and Father testified that he visited R.R.S. every day after he finished work.  Tr. 36:6–10; *see also* Tr. 51:9–20.  Father also described the care he provided to R.R.S. during these visits, including feeding and bathing R.R.S., playing with her, and bringing her to family events.  Tr. 29:16–30:5, 33:19–34:2, 36:11–19; *see also* Tr. 59:8–18.  Mother disputed Father's account of the frequency of his visits with R.R.S.; Mother testified that Father saw R.R.S. once every three weeks.  Tr. 14:5–10.  Mother and Father agree that each of them contributed financially to R.R.S.'s care, including food, diapers, and other necessities.  Tr. 78:24–79:14.  All agree R.R.S. was loved and cared for in Culiacan.

In April 2021, Mother informed Father she intended to remove R.R.S. from Mexico and take her to the United States "because you could lead a better life here."  Tr. 37:4–38:5.  Father told Mother he did not give permission to her to remove R.R.S. from Mexico.  Tr. 37:14–38:5, 42:25–43:9; P-10.  In a text message, Mother communicated to Father that she would not remove R.R.S. from Mexico without Father's authorization.  P-10.

Regardless, on May 11, 2021, Mother removed R.R.S. from Mexico.  Tr. 12:6–11.  That day, R.R.S. was supposed to be dropped off following daycare at the house of Father's parents, but R.R.S. did not arrive.  Tr. 43:10–15.  Father attempted without success to contact Mother by telephone, and Father's parents went to Mother's house but were met with no response.  Tr. 43:16–19.  Later that day, Mother called Father from an

3

unknown number and informed him she had taken R.R.S. to the United States. Tr. 43:20–23.

Mother and R.R.S. first relocated to Texas.  Tr. 12:15–17.  Father learned Mother and R.R.S. were in Texas through the family of R.R.S.'s half-brother.  Tr. 44:15–45:11. Father contacted attorneys, Mexican authorities, and the Office of Foreign Affairs in Mexico to attempt to secure R.R.S.'s return to Mexico.  Tr. 46:2–10, 61:16–62:8.  On November 5, 2021, about six months after R.R.S.'s removal, Father filed an application with Mexican authorities requesting R.R.S.'s return under the Hague Convention. Tr. 46:11–47:16; P-4.  Father credibly testified it took him until November 2021 to file the application with Mexican authorities because the authorities "had a lot of questions, a lot of requirements for [him], things that [he] needed to gather and fill out," and, "on top of that, it was the pandemic."  Tr. 47:1–16.  Around May 2022, a year after removal, Father identified and retained a Texas lawyer to initiate legal proceedings in the United States.  Tr. 62:9–17.  However, before Father filed a petition for R.R.S.'s return in a Texas court, Mother and R.R.S. left Texas.  Tr. 62:18–63:25.

In the summer of 2022, Father learned through Facebook that Mother and R.R.S. had moved from Texas to St. Paul, Minnesota.  Tr. 63:5–19, 64:13–22.  Father alerted the Mexican Office of Foreign Affairs of R.R.S.'s whereabouts and wrote the Office every two weeks requesting updates on his case.  Tr. 64:23–65:12.  Father eventually obtained counsel in Minnesota and initiated these proceedings.  Tr. 65:13–16.

Mother and R.R.S. have lived in St. Paul since the summer of 2022.  *See* Tr. 64:17–22, 112:22–23, 124:11–17.  While in St. Paul, R.R.S. attended preschool from

2022 to 2023, and kindergarten from 2023 to the present.  Tr. 123:3–12.  R.R.S. has attended the same daycare for after-school, holiday, and summer care since November 2022.  Tr. 124:11–17.  R.R.S. also receives medical, dental, and ophthalmological care in St. Paul.  Tr. 113:10–25, 125:3–8.  R.R.S. has befriended children at school and children of Mother's friends.  Tr. 115:4–8.

R.R.S. has a disability that affects her speech, gross motor skills, and balance. Tr. 118:11–121:1.  She has difficulty being understood in both English and Spanish, running and jumping, and using the bathroom.  *Id.*  Through her school, R.R.S. receives speech therapy and other treatment every day.  Tr. 121:2–19.  R.R.S.'s speech issues have improved through therapy.  Tr. 110:18–24, 120:17–19.  R.R.S.'s disability prevents her from participating in sports and other extracurricular activities, but she enjoys other activities such as going to museums and playing in the snow.  Tr. 114:9–25, 120:21–121:1.

Father has communicated with R.R.S. in video calls since R.R.S.'s 2021 removal. Tr. 66:3–15.  Father tries to speak with R.R.S. every day, but two or three days sometimes pass between their calls.  *Id.*; Tr. 86:17–21.  While Father was in St. Paul for the evidentiary hearing in this case, he spent a day with R.R.S.  Tr. 95:6–9.  Otherwise, Father has not seen R.R.S. in person since May 8, 2021.  Tr. 36:20–21.

R.R.S. continues to live with Mother and R.R.S.'s seventeen-year-old half-brother in St. Paul.  Tr. 112:22–113:5.  Mother, who also lacks legal status in the United States, Tr. 16:10–17:14, manages a fast-food restaurant.  Tr. 115:9–19.  She has worked in that job since August 2023.  *Id.*  Mother has weekends off from work and spends that time

with her children.  Tr. 110:25–111:8.  Since moving to St. Paul, Mother also has done janitorial work and has taken classes to learn English.  Tr. 111:9–11, 115:24–116:2. Father works at a government office in Culiacan "where they deal with taxes," and has a temporary, weekend job at a sports club.  Tr. 73:16–23, 77:2–14.

On December 29, 2023, Father filed a verified petition for return of R.R.S. under the Hague Convention,[2] the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001–11, and the Minnesota Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA"), Minn. Stat. § 518D.101 *et seq.*  Pet. ¶¶ 1, 31.  The same day, Father filed an *ex parte* motion for an accelerated hearing and a request for a temporary restraining order, seeking to enjoin Mother from removing R.R.S. from Minnesota pending expedited proceedings on the Petition.  ECF No. 3.  On January 12, 2024, a temporary restraining order was issued, enjoining Mother from removing R.R.S. from Minnesota for fourteen days.  ECF No. 10.  A show-cause hearing was held on January 31, 2024; at this hearing, Mother agreed not to remove R.R.S. from Minnesota, and case management deadlines were established in consultation with the parties.  An evidentiary hearing on the merits of the Petition was held April 8, 2024, ECF No. 24, and both parties filed post-hearing briefing, ECF Nos. 29, 31.

---

[2]     The United States and Mexico are signatories to the Convention.  *Status Table*, Hague Conference on Private International Law, https://www.hcch.net/en/instruments/conventions/status-table (last visited May 5, 2024).

II

A

"The Hague Convention 'generally requires courts in the United States to order children returned to their countries of habitual residence, if the courts find that the children have been wrongfully removed to or retained in the United States.'" *Rodriguez v. Molina*, 96 F.4th 1079, 1082 (8th Cir. 2024) (quoting *Chafin v. Chafin*, 568 U.S. 165, 168 (2013)). Hague Convention cases are not custody disputes. Hague Convention, art. 19; *see Ruiz v. Tenorio*, 392 F.3d 1247, 1250 (11th Cir. 2004) ("The court's inquiry is limited to the merits of the abduction claim and not the merits of the underlying custody battle.") (citation omitted). Proceedings under the Convention are "not to establish or enforce custody rights, but only to provide for a reasoned determination of where jurisdiction over a custody dispute is properly placed." *Barzilay v. Barzilay*, 600 F.3d 912, 916–17 (8th Cir. 2010) (internal citations and quotations omitted). And the Supreme Court has cautioned that "courts in Hague Convention cases must strive always to avoid a common tendency to prefer their own society and culture." *Galaviz v. Reyes*, 95 F.4th 246, 257 (5th Cir. 2024) (quoting *Soto v. Contreras*, 880 F.3d 706, 711 (5th Cir. 2018)) (cleaned up).

As the petitioner, Father bears the initial burden of establishing, by a preponderance of the evidence, that R.R.S. was wrongfully removed or retained within the Convention's meaning. 22 U.S.C. § 9003(e)(1)(A). The Convention provides that a child's removal or retention is wrongful if "it is in breach of rights of custody attributed to a person. . ., either jointly or alone, under the law of the State in which the child was

7

habitually resident immediately before the removal or retention," and if the petitioner was "actually exercis[ing]" those rights at the time. *Barzilay v. Barzilay*, 536 F.3d 844, 847 (8th Cir. 2008) (quoting Hague Convention, art. 3). To prevail on his Petition, then, Father must prove three things by a preponderance of the evidence: "First, he must show [Mexico] was [R.R.S.]'s habitual residence prior to removal . . . . Second, he must show the removal of [R.R.S.] violated his custody rights under [Mexican] law. Third, he must show he was exercising his parental rights before [R.R.S.] was removed." *Tsuruta v. Tsuruta*, 76 F.4th 1107, 1110 (8th Cir. 2023) (citing *Barzilay*, 600 F.3d at 917).

The Convention includes several affirmative defenses. Hague Convention, arts. 12, 13, 20; 22 U.S.C. § 9003(e)(2). "Wrongfully removed or retained children 'are to be promptly returned unless one of the narrow exceptions set forth in the Convention applies.'" *Rodriguez*, 96 F.4th at 1082–83 (quoting 22 U.S.C. § 9001(a)(4)). Relevant here, a court is not bound to return the child if there is "a grave risk" that return "would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, art. 13b. The respondent must prove the grave-risk defense by clear and convincing evidence. 22 U.S.C. § 9003(e)(2)(A). Also, if more than one year has elapsed between the child's removal and the commencement of return proceedings, a court must order the child's return "unless it is demonstrated that the child is now settled in its new environment." Hague Convention, art. 12. The respondent has the burden of proving this so-called "well-settled defense" by a preponderance of the evidence. 22 U.S.C. § 9003(e)(2)(B). If an affirmative defense

applies, a court retains discretion to order the child's return.  Hague Convention, art. 18; *see Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 271 (3d Cir. 2007).

B

Father has carried his initial burden of establishing by a preponderance of the evidence that R.R.S. was wrongfully removed.  (1) It seems undisputed that Mexico was R.R.S.'s habitual residence before removal.  "A child's habitual residence is the place where a child is at home, at the time of removal or retention."  *Tsuruta*, 76 F.4th at 1110 (internal quotations omitted).  Father has introduced R.R.S.'s Mexican birth certificate, showing she was born in Culiacan, Sinaloa, Mexico.  P-2.  Mother and Father agree R.R.S. resided in Culiacan from her birth in 2018 until her removal in 2021.  Tr. 11:25–12:2, 27:8–11.  There is no indication in the record that R.R.S. lived anywhere other than Culiacan before removal.

(2) Father has proven he had custody rights under the laws of Sinaloa.  The Sinaloa Code provides that "[p]arental authority on the children is exercised by the parents."  P-5 [Sinaloa Code, art. 350].  It also provides that "[i]n the event of separation of the persons exercising parental authority, *both* shall continue to comply with their duties and may agree on the terms of its application, particularly in matters related to the guardianship and custody of the minor children."  P-5 [Sinaloa Code, art. 351] (emphasis added).  Where, as here, Father and Mother are separated, "both shall continue to comply" with their parental duties.  Courts have found such rights under Mexican law to constitute "rights of custody" under the Hague Convention.  *See, e.g.*, *Whallon v. Lynn*, 230 F.3d 450, 459 (1st Cir. 2000).  The same conclusion is appropriate here.

9

(3) Father has established he was "actually exercising" his parental rights before R.R.S.'s removal.  Though the Hague Convention does not define "exercise," courts have found that custody rights are exercised "whenever a parent with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with his or her child."  *Friedrich v. Friedrich*, 78 F.3d 1060, 1065 (6th Cir. 1996) *see also, e.g.*, *In re Ahumada Cabrera*, 323 F. Supp. 2d 1303, 1312 (S.D. Fla. 2004) ("[C]ourts have found that in the absence of a ruling from a court in the country of habitual residence, a court should liberally find 'exercise' where a parent keeps or seeks to keep any sort of regular contact with his or her child.").  Father's testimony that he saw R.R.S. every day was credible.  Regardless, Mother agrees that Father saw R.R.S. at least every three weeks in Culiacan and that he has continued to talk with R.R.S. via video calls nearly every day while she has been in the United States.  Tr. 14:5–10, 66:3–15.  There is no serious question that Father kept regular contact with his child—before and after removal—and, as such, exercised his custody rights.[3]

To summarize, the record evidence shows Mexico was R.R.S.'s habitual residence prior to removal, that Father had custody rights under Sinaloa law, and that Father exercised his parental rights.  Father thus has established that R.R.S. was wrongfully

---

[3]     Mother disputes that Father exercised his custody rights while all parties were still in Culiacan.  Tr. 14:1–4.  Mother's arguments primarily focus on which parent did more for R.R.S.—who paid for care, whether buying milk and diapers was "enough to support the child," Tr. 79:9–17—rather than whether Father kept or sought to keep regular contact with R.R.S.  *Friedrich*, 78 F.3d at 1065.  Mother's arguments in this regard do not address the right question.  Mother concedes Father regularly spent time with R.R.S. in Culiacan.  Tr. 14:5–15.  That is enough to establish that Father "actually exercised" his rights.

removed.  Since Father has met his burden, the Convention "generally requires" R.R.S. to be returned to Mexico, unless a defense applies.  *Rodriguez*, 96 F.4th at 1082.

C

Mother asserted one affirmative defense in her Answer explicitly—that R.R.S. would face a grave risk of serious physical or psychological harm if she were returned under Article 13 of the Hague Convention.  Answer [ECF No. 18] at 2.  In support of this defense, Mother claimed: "The city of Culiacan, Sinaloa has a high level of risk in organized crime and the great psychological damage that R.R.S. can suffer when separated from the mother, [ ] R.R.S. is very well adapted in school, friends and activities [s]he does every day."  *Id.*  Though Mother categorizes this as a single affirmative defense under "Art. 13(1)" of the Convention, Mother's specific allegation that R.R.S. is "well adapted" in St. Paul is better understood to also raise the "well settled" defense under Article 12.

1

Article 13b says a court is not bound to return a child if "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation."  Mother must prove the defense by clear and convincing evidence.  22 U.S.C. § 9003(e)(2)(A).  Clear and convincing means "highly probable."  *Rodriguez*, 96 F.4th at 1083 (citing *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984)).  This standard requires "more than a preponderance of the evidence but less than proof beyond a reasonable doubt."  *Olson v. Snap Prods., Inc.*, 29 F. Supp. 2d 1027, 1036 (D. Minn. 1998) (citation omitted).

11

"Whether the respondent has established 'a grave risk of harm under the Hague Convention is a mixed question of law and fact.'" *Rodriguez*, 96 F.4th at 1083 (quoting *Acosta v. Acosta*, 725 F.3d 868, 874 (8th Cir. 2013)).   A court "must engage in 'a fact-intensive inquiry' to determine whether the respondent has proved a grave risk of harm, which requires 'careful consideration of several factors, including the nature and frequency of the abuse [and] the likelihood of its recurrence.'" *Id.* (quoting *Simcox v. Simcox*, 511 F.3d 594, 608 (6th Cir. 2007)).   Cases finding the grave risk exception has been met "often involve the use of physical force [against the child] that is repetitive or severe." *Galaviz v. Reyes*, 95 F.4th 246, 260 (5th Cir. 2024).   But external factors, such as war, famine, or disease, may constitute a grave risk as well. *Friedrich v. Friedrich*, 78 F.3d 1060, 1069 (6th Cir. 1996).

Examples are instructive.   In *Colon v. Mejia Montufar*, 470 F. Supp. 3d 1280 (S.D. Fla. 2020), a federal district court in Florida applied the grave-risk defense in the context of gang activity in Guatemala.[4]   There, the child had been threatened on two separate occasions by members of the MS-13 gang.   *Colon*, 470 F. Supp. 3d at 1286.   Gang members tried to recruit the child and threatened to harm him if he did not join.   *Id.* "Further, they told him that if he told anyone, then they would kill him and his family." *Id.*   After the child had been removed from Guatemala to the United States, gang members appeared at the child's house in Guatemala looking for him.   *Id.* at 1287.

---

[4]     Though the grave-risk defense was not established in *Colon*, the petition was denied, and the child was not ordered returned to Guatemala because evidence showed the child, then twelve years old, was mature enough to object to being returned.   *Colon*, 470 F. Supp. 3d at 1295–98; Hague Convention, art. 13.

Ultimately, the child's brother was forced to join the gang in the child's place. *Id.* at 1287 & n.8. The *Colon* court found the respondent (the child's mother) had not carried her burden of establishing a grave risk of harm to the child. The court focused on the heavy burden the respondent faced, noting: "'Grave risk' means something more than serious risk, but it does not have to be immediate. The level of risk and danger required to trigger this exception has consistently been held to be very high." *Id.* at 1292 (citations omitted). The court found there was no evidence the child's brother's MS-13 involvement posed a grave risk to the child or created a "zone of danger" that might expose the child to harm. *Id.* at 1293. The court also found that, because over one year had passed since the child was threatened by gang members, there was no evidence gang members would continue to target the child. *Id.* at 1294. The court further noted a lack of evidence that any harm posed was specific to the child. *Id.* ("Critically, there is no evidence that that the men sought to recruit [the child] for any reason other than the fact that gangs seek to recruit young males to join their gang."). The court found the threats were an "isolated event," indicating "that the risk of harm is not likely to resurface." *Id.* In all, the court found it was not "highly probable" that the child would face a grave risk of harm if returned to Guatemala.

Similarly, drug cartel-related violence has been rejected as the basis for a grave-risk defense in a federal court in Texas. In *Bernal v. Gonzalez*, 923 F. Supp. 2d 907 (W.D. Tex. 2012), the respondent (the children's father) argued there was a grave risk of harm if his children were returned to Sinaloa, Mexico, due to the "ongoing cartel violence." *Bernal*, 923 F. Supp. 2d at 920. The court noted the "high threshold" for

establishing the grave-risk defense and found it had not been met.  *Id.* at 921.  Though respondent testified about observing dead bodies in a river, and the children testified about being stopped by cartel members, witnessing "a tense situation in which an armed man pointed a gun directly at the driver of [a] vehicle," and more, the court found that the respondent did not establish by clear and convincing evidence a grave risk to the children.  *Id.*

Here, Mother points to the "high level of organized crime" as the basis for the defense.  Answer at 2.  In testimony, Mother asserted she "lost two brothers in a violent way," but she did not provide details in her hearing testimony.  Tr. 112:4–13.  It is true that Mother was personally affected by violence in Sinaloa when she was threatened in connection with robberies of the service station where she worked.  Tr. 106:4–107:19.  While working at the service station, Mother witnessed a murder in the parking lot.  Tr. 116:18–24.  Mother testified that she suffered armed robberies "maybe once a week," including when she was pregnant or when R.R.S. was at work with her.  Tr. 116:25–117:4.  Mother asserted that in a "wave of violence in Culiacan" in March 2024, five families—including children—were kidnapped.  Tr. 98:19–99:2.  She stated that her own brother-in-law and nephew were kidnapped in 2019, despite being uninvolved in drug trafficking.  Tr. 99:5–10.  Father testified he believes R.R.S. will be safe in Culiacan.  Tr. 74:21–75:19.

Mother has not carried her burden with respect to the grave-risk defense.  The ongoing violence and threat of organized crime in Sinaloa is of course a serious concern.  Regardless, the assertions do not establish a grave risk of harm to R.R.S. in the relevant

sense. It does not appear from the evidence presented that R.R.S. was ever threatened or harmed directly or specifically. Tr. 123:16–22. It has been about three years since Mother and R.R.S. lived in Sinaloa, and there is no indication any person or group would target them if they returned. Moreover, "[t]he level of risk and danger required to trigger this exception has consistently been held to be very high." *Colon*, 470 F. Supp. 3d at 1291; *see also Bernal*, 923 F.2d at 920. The record evidence does not establish a high probability that R.R.S. faces serious physical or psychological risk if she is returned. Hague Convention, art. 13; *Rodriguez*, 96 F.4th at 1083.

2

Mother's assertion that "R.R.S. is very well adapted in school, friends and activities [s]he does every day [in Minnesota]," Answer at 2, will be construed to advance the "well settled" defense under Article 12 of the Hague Convention. *See also* Tr. 14:16–18. Under Article 12, when more than a year has elapsed between the child's removal and the petitioner's commencement of return proceedings,[5] a court must return a child "unless it is demonstrated that the child is now settled in its new environment." Hague Convention, art. 12. That demonstration must be made by a preponderance of the evidence, 22 U.S.C. § 9003(e)(2)(B), meaning "the greater weight of evidence. It is the evidence which, when weighed with that opposed to it, has more convincing force and is

---

[5]      "[T]he term 'commencement of proceedings', as used in article 12 of the Convention, means, with respect to the return of a child located in the United States, *the filing of a petition* in accordance with subsection (b) of this section." 22 U.S.C. § 9003(f)(3) (emphasis added). Subsection (b), in turn, discusses filing a petition as commencing a civil action in a court with jurisdiction. Father filed the Petition in December 2023, more than two years after R.R.S.'s removal in May 2021.

more probably true and accurate." *Smith v. United States*, 726 F.2d 428, 430 (8th Cir.

1984) (recounting the district court's definition and finding no error).

    In determining whether a child is well-settled in her new environment, courts

consider the totality of the circumstances. *da Silva v. de Aredes*, 953 F.3d 67, 75 (1st Cir.

2020); *see also Neng Nhia Yi Ly v. Heu*, 294 F. Supp. 2d 1062, 1066 (D. Minn. 2003)

("[T]he court is permitted to consider any relevant factor, including the particular

circumstances surrounding the child's living environment."). The Hague Convention is

silent regarding what factors should be considered when analyzing the well-settled

defense. Courts have nonetheless identified various factors, including:

> (1) the age of the child; (2) the stability of the child's
> residence in the new environment; (3) whether the child
> attends school or day care consistently; (4) whether the child
> attends church [or participates in other community or
> extracurricular school activities] regularly; (5) the
> respondent's employment and financial stability; (6) whether
> the child has friends and relatives in the new area; and (7) the
> immigration status of the child and the respondent.

*Lozano v. Alvarez*, 697 F.3d 41, 57 (2d Cir. 2012) (alteration in original) (citation

omitted); *see also de Jesus Joya Rubio v. Alvarez*, 526 F. Supp. 3d 1186, 1202–03 (S.D.

Fla. 2021) (articulating similar factors). "The United States Department of State has

declared that 'nothing less than substantial evidence of the child's significant connections

to the new country is intended to suffice to meet the respondent's burden of proof' under

the well-settled defense." *Luis Alfonso V.H. v. Banessa Cristina A.Z.*, 512 F. Supp. 3d

633, 645 (W.D. Va. 2021) (quoting Hague Int'l Child Abduction Convention; Text and

Legal Analysis, 51 Fed. Reg. 10,494, 10,509 (March 26, 1986)).   On this evidentiary record, the better answer is that R.R.S. is not "well settled" in St. Paul.

It is true that one consideration favors finding that R.R.S. is well-settled in St. Paul: R.R.S. has attended school and daycare consistently in St. Paul since arriving here in mid-2022.   She is close to completing two grade levels—pre-kindergarten and kindergarten—in the St. Paul public school system.   Tr. 123:3–12.   R.R.S. has received therapy for her disabilities from her school.   Tr. 121:2–19.   Mother testified that R.R.S. receives this care for roughly thirty minutes of every school day.   *Id.*   And R.R.S. has attended the same daycare facility since November 2022.   Tr. 124:11–17.

Other considerations cut in the opposite direction or are neutral:

(a) It is difficult to understand how R.R.S.'s age should affect the analysis.   R.R.S. is six years old and has been in the United States for nearly three years, enough time for the well-settled defense to be considered, and enough time to become well settled.   Hague Convention, art. 12; *see de Jesus*, 526 F. Supp. 3d, 1202–04 (finding a child who lived in the United States less than two years to be well settled); *see also Neng Nhia Yi Ly v. Heu*, 294 F. Supp. 2d 1062, 1066 (D. Minn. 2003) (finding that a seven-year-old child removed from France was well-settled in St. Paul and noting the child "ha[d] spent more than half her young life in Saint Paul," and "has only vague memories of France").   At the same time, R.R.S. spent half her life in Culiacan and one year in Texas.

(b) It is easy to say that R.R.S. has not experienced meaningful stability in her young life.   It is difficult to tell whether R.R.S.'s St. Paul residence is stable.

R.R.S. was not brought directly to St. Paul from Culiacan.  She was brought first to Texas in May 2021, Tr. 12:15–17, meaning she has spent roughly two-thirds of her time in the United States in Minnesota, Tr. 64:17–19, 112:22–23, 124:11–17.   No record evidence shows whether Mother and R.R.S. have moved within St. Paul, how long they have resided at their current apartment, or how long they intend to remain there.   Apart from Mother's desire for R.R.S. to continue receiving services through the St. Paul public schools, Mother has not identified a specific tie or connection to St. Paul or Minnesota that would give her a strong incentive to continue residing here with R.R.S., as opposed to another city or location in the United States.

(c) R.R.S. has no church, extracurricular, or other organization-grounded connections in St. Paul.

(d) Clearly, Mother is hard-working and committed to providing for R.R.S., but the nature of her employment is ordinarily understood to be impermanent and not enduring.

(e) Though R.R.S. has formed friendships at school, the record lacks information regarding the number or qualities of those relationships.  Apart from Mother and her half-brother, R.R.S. has no relatives in Minnesota.

(f) Mother and R.R.S. do not have legal status in the United States, and no evidence suggests that either of them might seek—or be positioned to seek— legal status in the foreseeable future.  Tr. 8:21–22, 14:19–17:14.  There is no reason to think that Mother or R.R.S. faces a near-term risk of removal or

18

deportation.  Regardless, it would be a mistake to think that Mother and R.R.S.'s lack of legal status favors finding that the well-settled defense applies here.  It cuts the other direction.[6]

To summarize, I find that Mother has not shown by a preponderance of the evidence that R.R.S. is well-settled in St. Paul.  Though evidence of R.R.S.'s school and daycare attendance favors finding that R.R.S. is well-settled here, this evidence is outweighed by the absence of other community connections, the absence of any family in the community, R.R.S.'s (and Mother's) lack of lawful immigration status.  Evidence relevant to the stability of R.R.S.'s St. Paul residence, Mother's employment and financial stability, and R.R.S.'s age does not support a conclusion one way or the other as to the well-settled defense's applicability.

---

[6]    Courts have considered how much weight to give a child's lack of legal status in the well-settled-defense analysis.  While "no court has held it to be singularly dispositive," courts "have consistently found immigration status to be a factor when deciding whether a child is settled." *Lozano v. Alvarez*, 697 F.3d 41, 57 (2d Cir. 2012), *aff'd sub nom. Lozano v. Montoya Alvarez*, 572 U.S. 1 (2014); *see also da Silva*, 933 F.3d at 75–76.  In *da Silva v. de Aredes*, 953 F.3d 67 (1st Cir. 2020), for example, the First Circuit affirmed a district court's determination that a removed child was not well-settled in the United States.  Though the district court found the child had "developed meaningful relationships and lasting emotional bonds with a community in East Boston," it also determined that the child's "unsettled" immigration status in the United States, her mother's difficulty in finding stable employment, the child's constant tardiness and absence from school, and her adjustment disorder due to a lack of family, weighed in favor of finding the child not settled.  *da Silva*, 953 F.3d at 75–76.  In *Lozano*, the Second Circuit affirmed a district court's determination that a removed child was well-settled in New York though the child lacked legal status in the United States.  697 F.3d at 56–58.  Important to the court's affirmance, there was no evidence showing that the mother or child faced a threat of deportation, and evidence showed the mother was exploring how to gain legal status.  *See id.* at 46–48, 58.  These cases teach that a child's immigration status is not dispositive, but rather one factor to be considered alongside others to determine whether a child is well-settled in her new environment.

D

If the conclusion that Mother failed to prove the well-settled defense was incorrect, I would still order R.R.S. returned to Culiacan notwithstanding the well-settled defense's applicability.[7]  Recall that a court retains discretion to order a removed child's return even if the well-settled affirmative defense applies.  Hague Convention, art. 18; *Tsai-Yi Yang*, 499 F.3d at 271.  I would reach this decision for essentially two reasons.

(1) Mother's ability to credibly argue that R.R.S. is well-settled in St. Paul depends on the time it has taken Father to pursue R.R.S.'s return, but that delay is not Father's fault.  Father testified credibly that he has been working to secure R.R.S.'s return since she was removed.  *See supra* at 4.  Bureaucratic delays, the COVID-19 pandemic, and Mother's efforts to conceal R.R.S.'s location all delayed Father from filing this case.  These delays, in turn, gave Mother and R.R.S. time to settle in St. Paul.  In this situation, rigid application of the well-settled defense would be inappropriate.  *See Antunez-Fernandes v. Connors-Fernandes*, 259 F. Supp. 2d 800, 815 (N.D. Iowa 2003) (finding a removing parent should not benefit from the barriers another parent faced in bringing the petition).

(2) The record shows beyond question that R.R.S.'s reception in Culiacan will be stable, highly supportive, and family centered.  The record shows that Father (along with Mother) is capable of caring for R.R.S.  Father has stable employment, owns a home, and is surrounded by extended family who also are available and able to care for R.R.S.,

---

[7]     I cannot say the same with respect to the grave-risk defense under Article 13.  Had Mother proven that defense, I would have denied Father's petition.

Tr. 72:4–74:1, and who are "awaiting her return," Tr. 75:20–76:5.  It is undisputed that

R.R.S. has an extended family network in Culiacan that she lacks in St. Paul.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS**

**ORDERED THAT:**

1.      Petitioner Jesus Rafael Roman Rodriguez's Verified Petition for Return of

Child to Petitioner Under the Hague Convention [ECF No. 1] is **GRANTED**.

2.      R.R.S. shall be removed to Culiacan, Sinaloa, Mexico not later than June 7,

2024.  Unless the parties agree otherwise, removal shall be at Mother's expense.[8]

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  May 6, 2024                                s/ Eric C. Tostrud
                                                   Eric C. Tostrud
                                                   United States District Court

---

[8]      Father testified that he requires one month's notice to arrange travel to Minnesota
to accompany R.R.S. on her return to Mexico.  Tr. 24:17–20.